[Cite as *State v. Thomas*, 2016-Ohio-6996.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 15 JE 0013 |
| V. | ) | |
| | ) | OPINION |
| DOREN T. THOMAS, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:  Criminal Appeal from Court of Common
Pleas of County, Ohio
Case No. 14 CR 102, 14 CR 98

JUDGMENT:  Affirmed

APPEARANCES:
For Plaintiff-Appellee  Jane Hanlin
Prosecutor
Edward L. Littlejohn Jr.
Assistant Prosecutor
16001 S.R. 7
Steubenville, Ohio 43952

For Defendant-Appellant  Attorney Bernard C. Battistel
2021 Sunset Blvd.
Steubenville, Ohio 43952

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: September 22, 2016

DONOFRIO, P.J.

{¶1} Defendant-appellant, Doren Thomas, appeals from Jefferson County Common Pleas Court judgments convicting him of burglary in one case and aggravated burglary and robbery in another case.

{¶2} On June 23, 2011, Wintersville police responded to a burglary call at John Mavromatis's home. Two firearms were stolen from Mavromatis's house. The officer who responded to the burglary noticed the deadbolt on the basement door had been tampered with and the lock was "beat up." The officer also found a blood splatter on the door. DNA testing indicated that the blood belonged to appellant.

{¶3} On April 14, 2014, Cross Creek Township police responded to a home invasion call at the home of Robert and Harriet Coker. The Cokers reported to police that three men broke into their home through their basement door while they were home. The men threatened the Cokers and ran out of their house with two jewelry boxes and a laptop computer. A fourth man was waiting in a getaway car. One of the men dropped a jewelry box and the computer in the street. A fingerprint and palm print found on the dropped jewelry box was later identified as belonging to appellant.

{¶4} On August 6, 2014, a Jefferson County Grand Jury indicted appellant on one count of burglary, a second-degree felony in violation of R.C. 2911.12(A)(2), and two counts of theft, third-degree felonies in violation of R.C. 2913.02(A)(1) and (B)(4), arising from the crimes at the Mavromatis home.

{¶5} That same day, in a separate indictment, the grand jury indicted appellant on one count of aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(1), and one count of robbery, a second-degree felony in violation of R.C. 2911.02(A)(2), arising from the crimes at the Coker home.

{¶6} The cases proceeded to two separate jury trials. In the first case involving the crimes at the Mavromatis home, the jury found appellant guilty of burglary but not guilty of the two theft charges. In the second case involving the crime at the Coker home, the jury found appellant guilty of both aggravated burglary and robbery.

{¶7} At a subsequent sentencing hearing, the trial court sentenced appellant

to three years for the burglary conviction. It sentenced him to seven years on the aggravated burglary conviction and seven years on the robbery conviction, to run concurrently with each other. The court then ordered the three-year sentence to run consecutive to the concurrent seven-year sentences for a total prison term of ten years.

{¶8} Appellant filed a timely notice of appeal on June 9, 2015. He now raises three assignments of error. Appellant's first two assignments of error deal with his burglary conviction. His third assignment of error deals with his aggravated burglary and robbery convictions. We will address the first two assignments of error in reverse order for ease of discussion.

{¶9} Appellant's second assignment of error states:

THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION OF BURGLARY.

{¶10} Here appellant contends there was no evidence that he entered or trespassed into Mavromatis's house. He states the only evidence that connected him to the crime scene was a drop of blood that was found on the outside of an exterior door. Appellant also argues the state failed to prove that he had the purpose to commit a criminal offense in the house. He points out that the jury found him not guilty of the two theft charges that were allegedly committed inside the house.

{¶11} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113.

{¶12} The jury convicted appellant of burglary in violation of R.C. 2911.12(A)(2), which provides that no person, by force, stealth, or deception, shall trespass in an occupied structure with the purpose to commit a criminal offense therein.

{¶13} Wintersville Police Officer Chris Wright testified that he responded to a burglary call on June 23, 2011, at Mavromatis's house. (April 21, Tr. 65-66). Officer Wright was able to determine that the burglar or burglars gained entrance to the house at the basement door. (April 21, Tr. 67). He noticed that the lock was beat up and the dead bolt had been tampered with. (April 21, Tr. 67). He also noticed broken glass. (April 21, Tr. 73-74). Officer Wright also found a blood splatter on the basement door. (April 21, Tr. 69). He then contacted the Ohio Bureau of Criminal Identification and Investigation (BCI) to process the scene. (April 21, Tr. 70).

{¶14} Officer Wright also testified that a neighbor reported seeing a white male (appellant is a black male) leaving Mavromatis's house at approximately 10:30 p.m. the previous night. (April 21, Tr. 71). The white male was carrying a rug with something in it. (April 21, Tr. 72). The white male got into a white Mitsubishi. (April 21, Tr. 72). Officer Wright testified that in 2011, appellant owned a white Mitsubishi. (April 21, Tr. 77-78).

{¶15} Mavromatis testified that two guns were stolen from his home. (April 21, Tr. 86-87).

{¶16} Edward Lulla is the BCI crime scene investigator who responded to the Mavromatis burglary. Lulla testified that he observed a small amount of what appeared to be blood on the exterior side of Mavromatis's back door. (April 21, Tr. 93-94). He collected the substance so that it could be transported to the crime laboratory. (April 21, Tr. 94). Lulla also stated the window was broken, which appeared to be the point of entry. (April 21, Tr. 94). Lulla testified that the suspected blood was dry when he observed it. (April 21, Tr. 98). But he stated the blood was bright red, as opposed to dark red, which indicated to him that it was not very old because blood gets darker the longer it has been sitting on an object. (April 21, Tr. 98-99).

{¶17} Heather Bizub is the BCI forensic scientist who tested the blood found at the scene. Bizub testified that the substance recovered was in fact blood. (April 21, Tr. 107-108). She stated that after confirming the substance was blood, she compared the DNA from the blood to a known sample of appellant's DNA. (April 21, Tr. 108). Bizub testified that the DNA in the blood matched appellant's DNA. (April 21, Tr. 112). She testified the frequency of that particular DNA profile was 1 in 3 sextillion, 797 quintillion unrelated individuals. (April 21, Tr. 111).

{¶18} In addition to instructing the jury on the elements of burglary, the court also instructed the jury on aiding and abetting. Thus, the jury was able to convict appellant if they found that he supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in committing the burglary.

{¶19} The state presented sufficient evidence to support appellant's burglary conviction. The evidence demonstrated the following. Someone broke into Mavromatis's back/basement door by breaking a window and tampering with the lock. Blood was found on the door that was used to gain access to the house. The DNA from the blood matched appellant's DNA. Two guns were stolen from Mavromatis. A white male, which could not have been appellant, was seen leaving Mavromatis's house carrying a rug with something in it. The white male got into a white Mitsubishi. Appellant owned a white Mitsubishi at that time. Construing this evidence in the light most favorable to the state, as is required in a sufficiency of the evidence review, demonstrates that the state presented evidence going to each of the elements of burglary.

{¶20} Appellant asserts there was no evidence that he actually entered or trespassed into Mavromatis's house. But he could be convicted of burglary without ever setting foot into the house by way of aiding and abetting the white male who was seen leaving Mavromatis's house with something rolled up in a rug. At the very least, the evidence was sufficient to prove that appellant helped the white male break into Mavromatis's basement door and then drove the getaway car after the white male burglarized the house. This evidence is sufficient to convict appellant of burglary by way of aiding and abetting.

**{¶21}** Accordingly, appellant's second assignment of error is without merit and is overruled.

**{¶22}** Appellant's first assignment of error states:

THE DEFENDANT-APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶23}** In this assignment of error, appellant contends the evidence weighed heavily against his conviction.

**{¶24}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶25}** Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶ 49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶26} Appellant contends the only evidence against him in this case was a drop of blood on an exterior door. But what appellant does not mention is that this drop of blood was matched to his DNA at the frequency of one in 3,797,000,000,000,000,000,000. Thus, the evidence demonstrated that it was his blood on the door. Additionally, this was the door that was tampered with and used to gain entry into Mavromatis's house.

{¶27} Appellant also argues there was no evidence that he entered the house and stole the guns. But the evidence did not have to prove that appellant entered the house and stole the guns. It was enough that appellant aided and abetted a white male who stole the guns by helping him gain access to the house and by providing the white Mitsubishi getaway car.

{¶28} Finally, appellant asserts there were no eyewitnesses to place him at the scene. Appellant is correct that no eyewitnesses placed him at the scene. But appellant's DNA placed him at the scene.

{¶29} Based on the above, the jury's verdict was supported by the manifest weight of the evidence. Accordingly, appellant's first assignment of error is without merit and is overruled.

{¶30} Appellant's third assignment of error deals with his aggravated burglary and robbery convictions. Appellant's third assignment of error states:

THE DEFENDANT-APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶31} Appellant argues his convictions for aggravated burglary and robbery were against the manifest weight of the evidence.

{¶32} In this case, the jury convicted appellant of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an

accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]

{¶33} The jury also convicted appellant of robbery in violation of R.C. 2911.02(A)(2), which provides that no person in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall inflict, attempt to inflict, or threaten to inflict physical harm on another.

{¶34} We must consider all of the evidence and determine if the jury clearly lost its way in finding appellant guilty of these offenses.

{¶35} Cross Creek Township Police Officer T.J. Weyand testified that he responded to a call of a home invasion at the Coker home on April 14, 2014. (May 5, Tr. 85). When he arrived, Officer Weyand found Mrs. Coker in the middle of the street pointing to a jewelry box with its contents scattered about. (May 5, Tr. 85-86). Mrs. Coker advised Officer Weyand that one of the people involved carried the jewelry box out of the house. (May 5, Tr. 86). Officer Weyand secured the jewelry box in the back of his cruiser. (May 5, Tr. 86). Mrs. Coker advised Officer Weyand that three males entered her home, two black and one mixed, while one white male was the driver of their car. (May 5, Tr. 87).

{¶36} Bill Koniski lives across the street and one door down from the Cokers. Koniski testified that on the day in question he was waxing his car when he heard a car drive up the road and turn around. (May 5, Tr. 100). He noticed the car stop at the Cokers' driveway. (May 5, Tr. 100). Koniski saw three men get out of the car and run toward the Cokers' garage man door. (May 5, Tr. 100). After the three men ran toward the Cokers' door, the car drove up the road and turned into a church parking lot from where the driver could see the Cokers' house. (May 5, Tr. 101-102). The car then drove back toward the Cokers' house as the three others came running down the Cokers' driveway toward the street. (May 5, Tr. 102-103). Koniski stated

that one of the men tripped and dropped something he had been carrying. (May 5, Tr. 103). After the men left, Koniski saw that the items the one man dropped were a jewelry box and a laptop computer. (May 5, Tr. 104).

{¶37} Mr. Coker testified that he and his wife were in their kitchen when the door that led in from their basement opened. (May 5, Tr. 109). Three men ran from the door into the kitchen. (May 5, Tr. 110-113). One of the men pushed Mr. Coker and knocked him over out of his chair. (May 5, Tr. 110). All three men had handkerchief masks on their faces. (May 5, Tr. 112). Additionally, Mr. Coker stated the men had latex medical gloves on. (May 5, Tr. 118-119). One of the men put his hand in his pocket as if he might have a gun and ordered Mr. Coker not to move. (May 5, Tr. 111-112). Mr. Coker stated the men then ran out of his house with two jewelry boxes and a laptop computer. (May 5, Tr. 113-114). Mr. Coker was not able to identify appellant. (May 5, Tr. 125).

{¶38} Mrs. Coker corroborated her husband's testimony. Additionally, she testified that when the men ran out of her house, she went to a window that looks out at the street and she saw the three men get into a car. (May 5, Tr. 141). On their way to the car, Mrs. Coker saw one of the men trip and drop her jewelry box and laptop in the street. (May 5, Tr. 141). After she saw the men drive away, Mrs. Coker went outside to pick up her belongings that were in the street. (May 5, Tr. 141). Finally, Mrs. Coker testified that she never gave appellant permission to be in her house or to touch her jewelry box. (May 5, Tr. 142-143).

{¶39} Edward Lulla, the BCI crime scene investigator, processed the crime scene. Lulla testified that he was able to lift fingerprints from the jewelry box that Officer Weyand recovered from the middle of the street. (May 5, Tr. 129). The fingerprints were then sent to BCI for analysis. (May 5, Tr. 129).

{¶40} Ashley Owen analyzes latent fingerprints at BCI. Owen testified that when she received the fingerprints in this case, she ran them through the Automated Fingerprint Identification System (AFIS). (May 5, Tr. 156). AFIS provided her with a list of 20 candidates for the fingerprints, one of which was a match. (May 5, Tr. 156). Owen was able to determine that the left middle fingerprint she provided matched a

fingerprint on file for appellant. (May 5, Tr. 156-157). She was also able to match a palm print to appellant. (May 5, Tr. 157). Owen was able to testify to a reasonable degree of forensic certainty that the prints from the jewelry box belonged to appellant. (May 5, Tr. 159). On cross-examination, Owen stated it would be very rare that a person wearing latex gloves would leave a fingerprint on a surface. (May 5, Tr. 160).

{¶41} Loreal Payton was the last witness. Payton described appellant as being "like a brother" to her. (May 5, Tr. 165). Payton testified that appellant was at her house on April 14, 2014, when she overheard him saying on the phone that he was going to "hit a lick" in Wintersville. (May 5, Tr. 165-166). This meant he was going to rob someone. (May 5, Tr. 166). Appellant asked Payton for a pair of gloves. (May 5, Tr. 167). Payton stated that she gave appellant hospital gloves. (May 5, Tr. 167). She stated she knew he was going to use them to rob someone. (May 5, Tr. 167). Payton testified that later that day she heard on the news that the Cokers' house was robbed. (May 5, Tr. 168). She stated that the Cokers are her cousins. (May 5, Tr. 168). When she heard the news, Payton called Mr. Coker and asked if the robbers had gloves and trash bags. (May 5, Tr. 169). When appellant came back to Payton's house, she told him to leave and not come back. (May 5, Tr. 169).

{¶42} Appellant argues that no witnesses identified him as one of the individuals that burglarized the Coker house. While no eyewitness identified appellant, his fingerprint and palm print were both found on Mrs. Coker's jewelry box, which was dropped by one of the robbers when fleeing from the scene. Thus, appellant's finger and palm prints identified him.

{¶43} Appellant next claims he had previously done work at the Coker house, so his fingerprints could have been left on the jewelry box during a prior visit. But appellant never presented any evidence that he actually worked at the Coker house. On cross-examination of the Cokers, appellant's counsel tried to elicit testimony that appellant could have worked at their house previously. (May 5, Tr. 122-123, 143-145). But Mr. Coker testified that he did not remember appellant ever being at his house. (May 5, Tr. 122). And Mrs. Coker stated that to her knowledge appellant had never been to her house. (May 5, Tr. 145). Thus, there was never any evidence that

appellant had actually ever been to the Coker house on another occasion.

{¶44} Moreover, it was not appellant's fingerprints alone that incriminated him. In addition to his fingerprints on the jewelry box, the jury heard Payton's testimony. According to Payton, on the day of the robbery she overheard appellant saying to someone on the phone that he was going to "hit a lick," which meant he was going to rob someone. And appellant admitted to Payton he was going to commit a robbery and asked her for gloves for that purpose. Payton gave him latex hospital gloves. The men who robbed the Cokers were wearing latex hospital gloves. After learning that her cousins were the victims of the robbery, Payton made appellant leave her house.

{¶45} Taking all of the evidence into consideration, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. The weight of the evidence supports appellant's convictions for aggravated burglary and robbery. Accordingly, appellant's third assignment of error is without merit and is overruled.

{¶46} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.